JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

Brian J. Preskl

**(b)** County of Residence of First Listed Plaintiff   Atlantic
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
David P. Heim, Esquire
Bochetto & Lentz, P.C.
1524 Locust Street, Philadelphia, PA 19102

**DEFENDANTS** Joshua David Shapiro as Attorney General of the
Commonwealth of Pennsylvania, Dauphin County
Probation Services and/or Chad Libby as Director of Dauphin County
Probation Services

County of Residence of First Listed Defendant   Dauphin
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 | Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*                                              Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☒ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 2254
Brief description of cause:
Petition For Writ of Habeas Corpus

**VII. REQUESTED IN COMPLAINT:**   ☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $
Non-Money

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

**VIII. RELATED CASE(S) IF ANY**   *(See instructions)*   JUDGE  Richard A. Lewis, President Judge   DOCKET NUMBER  CP-22-CR-2683-2010

DATE   2/19/19

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #         AMOUNT         APPLYING IFP         JUDGE         MAG. JUDGE

## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF PENNSYLVANIA

**BRIAN J. PRESKI,**                                  :
                                                      :            No. _____
        *Petitioner*                        :
                                                      :
    v.                                    :
                                                      :
**JOSHUA DAVID SHAPIRO as**                           :
**ATTORNEY GENERAL OF THE**                           :
**COMMONWEALTH OF**                                   :
**PENNSYLVANIA, DAUPHIN COUNTY** :
**PROBATION SERVICES, and/or**                        :
**CHAD LIBBY as DIRECTOR OF**                         :
**DAUPHIN COUNTY PROBATION**                          :
**SERVICES,**                                         :
                                                      :
        *Respondents*                      :
                                                      :

## PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254

**AND NOW COMES** Petitioner Brian J. Preski ("Preski"), by and through undersigned

counsel Bochetto & Lentz, P.C. ("B&L"), and avers the following in support of his petition for

relief under 28 U.S.C. § 2254:

## INTRODUCTION

Preski comes before this Court seeking relief from a prosecution tainted by the most

fundamental constitutional breaches.   First, he was denied an unbiased judge; the prosecutor,

then-Chief Deputy Attorney General Frank Fina ("Fina"), hired the trial judge's law clerk

immediately after the trial, after the judge made key rulings against Preski while the clerk's

application with the prosecutor's office was pending.   This presents the same kind of bias

recently warned against by the United States Supreme Court in *Williams v. Pennsylvania*, 136 S.

Ct. 1899, 195 L. Ed. 2d 132 (2016), where there was an impermissible connection between a

prosecutor and judicial review of a criminal case.   Second, that Fina admitted to destroying

1

exculpatory evidence and then hid the fact that he destroyed it, in clear violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

Brian Preski was one of ten co-defendants in the Dauphin County "Computergate" prosecution and trial. A politically-motivated offshoot of Fina's highly-publicized "Bonusgate" prosecutions (involving "bonuses" paid to state employees for campaign work), Computergate involved an alleged multi-year scheme orchestrated by former Pennsylvania House Speaker John Perzel to use taxpayer funds to acquire highly-sophisticated voter databases, ostensibly for permitted constituent services but diverted to support Republican campaign activities. The case arose after then-Attorney General Corbett sought, and was refused, Perzel's support in seeking gubernatorial office. *Zimmerman v. Corbett*, 873 F.3d 414, 416 (3d Cir. 2017), *cert. denied*, 138 S. Ct. 2623, 201 L. Ed. 2d 1027 (2018). In brief, Preski was accused of commingling political and governmental work in violation of Pennsylvania law.

Unknown to Preski at the time of his trial, however, the prosecution had taken notes from an exculpatory witness, Lori Lochetto, over several sessions, in which Lochetto—who worked with Preski—stated that Preski was punctilious in separating his governmental and political work. Lochetto's exculpatory statements should have been included in the official Record of Investigation ("ROI"), and the prosecution's notes preserved; instead, the notes were destroyed and never transferred to the ROI, effectively suppressing Preski's ability to uncover the prosecution's receipt of the Lochetto statements, particularly as ***the prosecution admitted to destroying notes from 94 witnesses*** and presented the incomplete ROI as complete to the trial court.

At the same time Preski requested relief from the trial court regarding the destroyed discovery, however, the trial judge's law clerk was in the process of applying to work with

Fina—a job he received shortly after Preski's guilty plea. Numerous issues were resolved against Preski during the period while this clerk sought a permanent job entailing a 44% increase in pay, and the conflict of interest was never disclosed prior to Preski's plea.

Unfortunately, the essential facts in these constitutional violations were hidden from view for years. It was not until Preski's co-defendant Brett Feese filed his PCRA petition that Preski learned that Fina was hiring the trial judge's law clerk during Preski's trial. Preski did not learn of this bias and fundamental conflict of interest until September 2015, and no reasonable diligence would require the investigation of a judicial clerk's employment search.

Similarly, Preski could never have learned of Lochetto's exculpatory testimony prior to seeing the Feese Petition in September 2015. Prior to his trial, the prosecution admitted the destruction of 94 witness statements, but asserted that the ROI preserved the relevant information. This is known to be patently false now, but Preski had no way of knowing that the prosecution falsified the ROI at the time. Requiring Preski to *assume* prosecutorial misconduct (and interview 94 witnesses) under the reasonable diligence standard impermissibly transforms that standard into pure paranoia—the presumption that *every* representation of an officer of the court is factually incorrect. This fundamentally misconstrues United States Supreme Court precedent, which permits defendants to rely upon the duty of a prosecutor to disclose exculpatory evidence. *Banks v. Dretke*, 540 U.S. 668, 695 (2004).

For these reasons, as set forth in more detail below, the interests of justice and the Constitution itself requires the issuance of the Great Writ under these circumstances.

## **PETITION**

1.     Petitioner is presently on probation, having served his sentence pursuant to a judgment entered in the Court of Common Pleas of Dauphin County, the Hon. Richard A. Lewis,

3

presiding (the "trial court"). *Massey v. Brooks*, No. 07-1567, 2007 WL 3243367, at \*5 (E.D. Pa. Oct. 29, 2007) (unreported) ("A petitioner who is on parole or probation is still 'in custody.'").

2.    Petitioner has exhausted his state appeals.

3.    Although Petitioner pled guilty, he did so without exculpatory information withheld by the prosecutor and without the knowledge that the court was biased against him, both of which cause his guilty plea to be less than voluntary and intelligent when made.

4.    There are no other petitions or appeals pending in any state court or Federal court relating to the judgment under attack herein.

5.    Newly discovered evidence demonstrates that Preski's conviction resulted from violations of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution as well as federal jurisprudence.

6.    These violations so undermined the truth-determining process and the decision-making process as to whether or not to plead guilty that no reliable adjudication of guilt or innocence has taken place.

7.    The material withheld from Preski prevented him from making an informed decision about whether to plead guilty.

8.    Absent the alleged prosecutorial misconduct, Preski would not have pled guilty, and the United States Constitution requires that he be permitted to withdraw his plea so his conviction can be vacated.

9.    The newly discovered evidence presented herein, either solely or in the aggregate, would have changed the outcome of Preski's prosecution and his mid-trial decision to plead guilty if that evidence had been available for use at trial.

10.    This Petition is filed within the time limitations imposed under 28 U.S.C. § 2254.

11.     As more specifically set forth herein, the facts upon which this request for relief are predicated were previously unknown to Preski and could not have been ascertained by the exercise of due diligence.

## PROCEDURAL HISTORY

12.     On November 13, 2009, Preski was arrested for and charged with multiple counts of conflict of interest, theft, and conspiracy related to the alleged use of state resources for political campaign purposes.  The fundamental theory against Preski was that he commingled governmental work with political work.

13.     Preski pleaded not guilty to all charges.

14.     Prior to trial, Preski sought discovery of witness interview notes, proffer statements, and other potentially exculpatory materials from the Pennsylvania Office of Attorney General ("OAG").  *See* Appellate Record on PCRA Petition, R. 30a-39a, 263a-269a, attached hereto as Exhibit "A."

15.     Contradicting prior assurances that exculpatory witness interview notes and proffer statements would be produced, the OAG admitted in a June 13, 2011 pretrial conference that interview notes for 94 witnesses who appeared before the grand jury had been destroyed. Ex. "A" at R. 33a.

16.     The prosecutor who made this admission was then-Chief Deputy Attorney General Frank Fina.

17.     On July 11, 2011, Preski and the other defendants filed a Joint Motion to Dismiss for Prosecutorial Misconduct, specifically alleging that "at a Pre-Trial Conference on June 13, 2011 Chief Deputy Attorney General Frank Fina stated that the OAG had destroyed all proffer notes of all witnesses in the instant cases."  Ex. "A" at R. 34a.

18.     In response to the Joint Motion, the OAG confirmed its deliberate destruction of interview notes for 94 witnesses, but claimed that the notes had been destroyed in full accord with long-standing agency policy, specifically "Chief Memorandum 2001-02." Ex. "A" at R. 35a.

19.     In a July 29, 2011 Memorandum Order, Judge Lewis denied the Joint Motion, accepting at face value the OAG's explanation that "the 'proffer notes' in question were destroyed pursuant to an internal policy of the Office of the Attorney General." Ex. "A" at R. 6a; 37a-38a.

20.     Contrary to that finding, Chief Memorandum 2001-02 plainly prohibits the destruction of interview notes until: (1) the notes are transposed into a formal "Report of Investigation ("ROI")"; and (2) that transposition is approved by the appropriate OAG Regional or Deputy Supervisor. Ex. "A" at R 06a-7a; 36a.

21.     Of the 183 witnesses who testified before the Computergate Grand Jury, the OAG omitted from the ROI any reference to interviews notes or proffer for 94 of those witnesses; thus, the OAG not only deliberately destroyed potentially exculpatory Brady material, in violation of its own internal policy, but conceded that destruction.   Ex. "A" at R. 35a-36a.

22.     On September 28, 2011, a jury trial of the matter commenced before the Honorable Richard A. Lewis.

23.     Preski proceeded to trial with three other defendants.

24.     As Preski proceeded with the trial, it was of the utmost importance that he possessed all exculpatory, impeachment, and cross-examination material, but he was denied this important constitutional right because of the destruction and suppression of evidence by the prosecution.

6

25.     On October 6, 2011, after six days of trial, without the benefit of the production of the materials destroyed by the OAG put at issue by this Petition and unaware of the additional facts raised in the Feese Petition, Preski was compelled to enter an open guilty plea to three counts of conflict of interest, two counts of theft of services, and five counts of criminal conspiracy.  (The Commonwealth withdrew 62 of the Criminal Information's original 72 felony counts.)

26.     On March 21, 2012, the Dauphin County Court of Common Pleas sentenced Preski to, inter alia, a minimum imprisonment of 24 to 48 months (with "Recidivism Risk Reduction Incentive"), followed by a parole term set to expire in April 2016, followed by five years of probation.

27.     On April 11, 2012, Preski reported to the Dauphin County Prison, and was transferred to SCI-Camp Hill, and was thereafter transferred to SCI-Mercer, where he was confined until October 13, 2014.

28.     In early September of 2015, Preski obtained a copy of a PCRA petition filed by his co-defendant, Brett Feese (the "Feese Petition"), which was filed on August 31, 2015.

29.     The Feese Petition disclosed evidence of prosecutorial misconduct previously unknown to Preski.

30.     On October 9, 2015, Preski filed his PCRA petition with the Dauphin County Court of Common Pleas.[1]

31.     Preski filed a motion to recuse and a motion to compel discovery on the OAG during the pendency of his PCRA petition.

---

[1] After obtaining the Feese Petition, Preski (through counsel) also filed a Right-to-Know request to the Pennsylvania Attorney General seeking documents suppressed by the prosecution, but did not receive anything in response. Ex. "A" at R. 16a.  Preski also filed a motion to compel discovery on the Office of the Attorney General. *Id.* at R. 161a.

32.     Preski's motions to recuse and to compel discovery were denied on May 13, 2016.

33.     Preski's PCRA petition was dismissed on January 9, 2016.

34.     Preski timely appealed to the Pennsylvania Superior Court on February 3, 2017.

35.     The Superior Court denied Preski's appeal on December 12, 2017.

36.     Preski sought reargument en banc on December 26, 2017; reargument en banc by the Superior Court was denied February 23, 2018.

37.     On March 23, 2018, Preski filed his petition for allowance of appeal with the Supreme Court of Pennsylvania; this petition was denied September 26, 2018.

## STATEMENT OF FACTS

## I.      DESTRUCTION OF WITNESS STATEMENTS AND PROFFER NOTES

38.     In the Computergate investigation, the OAG called 183 witnesses before the Grand Jury which returned the Presentment against Preski. Ex. "A" at R. 22a; July 1, 2011, Joint Motion to Dismiss at 1-2, attached hereto as Exhibit "M."

39.     Many of these witnesses provided proffer statements to the OAG, some on multiple occasions. *Id.* at R. 23a.

40.     Notes of these witness interviews and proffer statements were routinely taken by OAG attorneys and agents. *See* Lock Certifications on Tomaselli, Cherry-McGill, Perzel, Lochetto, Morey, and Hanley, attached hereto as Exhibit "B."

41.     The notes of interviews conducted with or proffer statements taken from 94 of these witnesses were suppressed or destroyed by the OAG, as admitted by Frank Fina. Ex. "A" at R. 22a; Ex. "M" at 3.

42.     The OAG, while acknowledging the destruction of such notes, sought to justify its conduct with assertions that: (1) the destruction occurred in conformity with office policy, and;

8

(2) all disclosures, including assertions of innocence and inconsistent statements or other impeachment material, made by these 94 witnesses during their interviews/statements were elicited by the OAG when the witnesses testified before the Grand Jury, and, therefore, were contained in the transcripts of the Grand Jury testimony of these witnesses which were provided to the defense prior to trial. *See* N.T. July 20, 2011 argument on Joint Defense Motion at 114:25, 115:2, attached hereto as Exhibit "C"; Ex. "A" at R. 34a; July 1, 2011, Ex. "M" at 1-2.

43.     In a July 29, 2011 Memorandum Order, in response to a Joint Defense Motion to Dismiss, Judge Lewis found "that not all the proffer interviews conducted were properly memorialized in the Report of Investigation and that the grand jury transcripts do not adequately capture possible underlying inconsistent statements." July 29, 2011 Memorandum Order at 4, attached hereto as Exhibit "N."

44.     Despite that finding, the Court denied the Motion to Dismiss, concluding that because of the destruction of the notes, it was impossible to determine their "materiality," and thus impossible to "find that the destruction of the proffer notes in question rise to the level of a due process violation." *Id.*

45.     The trial court's ruling made a mockery of the legal standards governing destruction and suppression of evidence by the prosecution.

46.     The trial court effectively ruled that if prosecutors completely destroy evidence to the point that no one could determine what, if any, exculpatory evidence there was, it means the defendant cannot meet the standard of proving prejudice.

47.     This turns the concept of *Brady* and its progeny into a dead letter, and encourages the destruction of exculpatory evidence.

48.     Indeed, the OAG represented to this Court: "As explained previously, had such

prior inconsistent statements not been included in the grand jury testimony, they would have

been included in the ROI." Ex. "A" at R. 35a; Ex. M.

49.     The fact of the matter is, with the discovery of this new evidence (the statements

of William Tomaselli, John Hanley, John P. Perzel, Lori Cherry-McGill, Mary Beth Morey, and

Lori Lochetto), it is clear that the OAG's representation was false.

50.     By way of example only, based on Lochetto's interview alone, it is clear that the

OAG withheld *Brady* evidence and that such evidence was "material" to guilt or innocence. See

Exhibit "C" hereto (undersigned Counsel's Certification of September 30, 2015 interview).

51.     With respect to Hanley, the record is particularly damning.

52.     The grand jury testimony revealed a "disastrous proffer session" that was not

reflected in the ROI. Ex. "C" at 124-25.

53.     Similarly, the destruction of evidence as to Tomaselli also worked special harm

on Preski, as Tomaselli was a key witness in the case and in the argument on the Joint Motion,

the issue of being unable to confront Tomaselli with multiple prior statements was specifically

raised. Ex. "C" at 102:16-18.

54.     Lochetto was interviewed by OAG at least five or six times, during which she

gave extensive exculpatory testimony, and during which hand-written notes were routinely taken

by members of the OAG team.

55.     Yet not a single statement by Lochetto, nor a single summary of any statement

made by Lochetto, appears anywhere in the ROI, and at no time did the OAG elicit any such

exculpatory testimony during Lochetto's Grand Jury testimony. *See* Ex. "A" at 57a-65a

(excerpted pages from ROI referencing Lochetto), 67a-78a (full transcript of Lochetto's October

30, 2009 Grand Jury testimony).

56.     Lochetto is important because she worked as one of Preski's numerous assistants for a period of seven years, and was therefore in a position to testify effectively concerning Preski's procedures at work.

57.     Lochetto now states that she explained to the OAG investigators in great detail the lengths that Preski went to in order to separate his government activities from his political activities.  *Id.* at 54a-55a (Counsel's Certification of interview with Lochetto).

58.     Lochetto states that she provided to the OAG (who were taking notes) detailed factual examples of the means by which Preski separated his legislative functions from his campaign activities.

59.     This testimony goes to the heart of the prosecution's case, which accused Preski of commingling government and political activity.

60.     Yet none of this exculpatory testimony by Lochetto (recorded in the form of notes taken during the interviews) was ever elicited before the Grand Jury or incorporated into the ROI.

61.     That being the case, the OAG's claim that these records were "destroyed under OAG policy" is false. The OAG destroyed such notes contrary to its Policy.

62.     Chief Memorandum 2001-02 plainly prohibits the destruction of interview notes until: (1) the notes are transposed into a formal "Report of Investigation ("ROI")"; and (2) that transposition is approved by the appropriate OAG Regional or Deputy Supervisor.  Ex. "A" at R. 06a-7a; 36a.

63.     These two policies were violated by the OAG in destroying exculpatory evidence in this matter, despite the fact that these policies exist (in theory) to assist in the protection of such evidence.

64.     It has also been discovered that the OAG coerced witnesses, including John P. Perzel, to provide inculpatory testimony by threatening such witnesses with prison time (or additional prison time) if their testimony did not conform to the prosecution's script.

65.     In the absence of knowing the foregoing, Preski could not as a matter of law have made a knowing guilty plea; absent the prosecutorial misconduct, Preski would not in fact have pled guilty.

66.     The prosecutorial misconduct is magnified by Preski's guilty plea, as he was not only deprived of his full ability to cross examine and confront witnesses, but the destroyed exculpatory evidence deprived Preski of a full trial by jury which would have made a determination as to innocence; instead, without the undisclosed exculpatory evidence Preski felt compelled to personally plead guilty and foregoe his right to a jury trial.

67.     The OAG's prosecutorial misconduct raises a reasonable possibility under *United States v. Bigley*, 437 U.S. 667 (1985), and *Kyles v. Whitney*, 514 U.S. 419 (1995), that, had this significant evidence been disclosed, the result of the prosecution would have been different.

68.     Prosecutors must be expected to discharge their official duties rather than hide evidence from defendants in defiance of due process, as Fina did here. *Banks v. Dretke*, 540 U.S. 668, 696 (2004).

69.     The prosecution's deliberate suppression of materials that Preski's defense expected to be in the ROI eliminated the ability of Preski to discover the known exculpatory evidence of several witnesses (including Lochetto's ) .

70.     Preski could never have uncovered the extent of the prosecutorial misconduct in this matter, and the burden was not upon him to do so. *Banks,* 540 U.S. at 696.

## II.     BIAS OF THE TRIAL COURT IN THE HIRING OF THE TRIAL JUDGE'S LAW CLERK

71.     Clarke Madden ("Madden") began employment as the law clerk of the Hon. Richard A. Lewis, the trial judge in this matter, on May 19, 2008.

72.     Pursuant to his duties as a law clerk, Madden was to "assist the courts and Judge by conducting legal research and drafting opinions," "Participate[] as consultant to the Judge in pre-trial proceedings," and "prepare[] and review[] the jury charge." Ex. "A" at 120a-22a.

73.     Madden described his role as law clerk to Judge Lewis as follows: "Participated extensively in several high profile cases such as the 'Bonusgate' and 'Computergate' trials and the 'Incinerator' litigation. Assisted the Judge in resolution of matters before the court." *Id.* at 124a-26a.

74.     Preski was charged and tried as part of "Computergate," on which Madden admitted to working.

75.     In 2009 and 2010, Madden took more than 1000 hours off without leave. *Id.* at 128a, 130a.

76.     Madden remained law clerk to Judge Lewis through the beginning of trial in Preski's criminal case.

77.     On August 20, 2010, a Deputy Attorney General position in the Criminal Prosecutions Section/Harrisburg became available, and was in fact eventually filled by Madden.

78.     This is particularly problematic, as Madden was not applying for a position as a generic Deputy Attorney General, but was in fact applying for a job in the specific office prosecuting Preski.

79.     On September 14, 2011, the Criminal Division circulated a request to fill the vacant position in the Criminal Prosecutions Section/Harrisburg. *See* Position Action and Budgetary Authorization Request, attached hereto as Exhibit "D."

13

80.     Madden applied online to fill the vacancy the next day, although his application was incomplete as to job history and education. *See* Madden emails, attached hereto as Exhibit "E."

81.     Prior to the commencement of Preski's trial, the court heard argument of counsel and conducted in-camera review of documents on the pre-trial motions prior to the trial court's decision, ***but did not hear witness testimony despite the request of counsel***, thus enhancing the role of Madden as law clerk in assisting Judge Lewis's legal decision. Ex. "C" at 103:4-5.

82.     Jury selection began in Preski's trial on September 19, 2011, after denial of Preski's motion to dismiss for prosecutorial misconduct.

83.     On October 5, 2011, the OAG Director of Human Resources forwarded a list of candidates for the vacant Deputy Attorney General position to Fina, who was trying the case against Preski in front of Judge Lewis.

84.     Preski pled guilty on October 5, 2011.

85.     The next day, Madden emailed the Human Resources regarding the deficiencies in his resume, claiming to have uploaded information that was not uploaded. Ex. "E."

86.     On October 28, 2011, after further contact between Madden and the OAG by email, Human Resources notified Fina that Madden had been added to the list of candidates. *See* Saul email to Fina of Oct. 28, 2011, attached hereto as Exhibit "F"; Response to Feese Right to Know Request at 3, attached hereto as Exhibit "G."

87.     Fina was involved in ranking Madden as the most-qualified candidate, despite the pending application of an experienced prosecutor. *See* Madden Application Transmittal Sheet, attached hereto as Exhibit "H."

88.     Madden was listed as the most qualified candidate during a trial in which copious

14

exculpatory evidence was withheld from the defendants, despite his incomplete application and failure to work anything resembling a full schedule as a law clerk.

89.     Trial against Preski's co-defendant Feese ended on November 8, 2011, and Madden was approved to be hired on November 29, 2011.  *See* Madden Personnel Action, attached hereto as Exhibit "I."

90.     The Executive Attorney General and Fina were advised of this decision swiftly, and the EAG commented to Fina in an email, "That was fast."  *See* Sheetz email of Nov. 29, 2011, attached hereto as Exhibit "J."

91.     Preski was unaware of Madden's seeking employment with the OAG during his criminal case, and, in fact, did not learn of Madden's employment application with the OAG until reading Feese's PCRA petition in September 2015.

92.     Madden received a substantial raise—44%—upon obtaining the Deputy Attorney General position.  Ex. "A" at R. 43a; Madden Pay Record, attached hereto as Exhibit "K."

93.     Feese only learned of the content of emails between Madden and the OAG after the release of the Moulton Report on the Sandusky investigation in 2014.

94.     Preski only learned of the Madden issue in September 2015, when he read Feese's August 31, 2015 petition for relief under Pennsylvania's Post-Conviction Relief Act ("PCRA").

## III.     PROSECUTOR FINA'S HISTORY OF SEVERE MISCONDUCT

95.     Fina's involvement in Preski's prosecution requires special attention from this Court, as he has been found to have fallen far below the standards expected of a prosecutor.

96.     The Court should take judicial notice of the following:

      a.   Shortly after Preski's trial, Fina and the OAG became embroiled in repercussions flowing from the investigation of Penn State and Jerry

Sandusky, resulting in the scandal known as "Porngate."

b.   In the Sandusky investigation, Fina represented to a court that he would avoid questioning an attorney about issues subject to attorney-client privilege, but, "[d]espite the foregoing representations by Mr. Fina, a significant number of the Commonwealth's questions to Ms. Baldwin before the grand jury implicated potential confidential communications." *Commonwealth v. Spanier*, 132 A.3d 481, 487 (Pa. Super. Ct. 2016). The Superior Court called Fina's behavior "highly improper." *Id.* at 488 n.11.

c.   Fina, while ostensibly working for the Commonwealth of Pennsylvania as a prosecutor upholding the law, forwarded racist and misogynist emails to colleagues (presumably in the OAG). Joel Mathis, "Here's What's in All Those Porngate Emails Kathleen Kane Keeps Talking About," phillymag.com (Aug. 25, 2015), attached hereto as Exhibit "L." Emails from Fina portray women performing sex acts as part of their employment duties; a description of the word "wife" as an acronym for domestic and sexual duties; use of the term "gay" in a derogatory manner; and "Fina's group of *faux* motivational posters included an image of a white man, carrying a bucket of fried chicken, being accosted by two deranged-looking black men. The caption? 'Bravery at its finest.'" *Id.*

d.   Fina's emails—available through metro.us—contain graphic, demeaning, and racist images and text. *See* Sam Newhouse, "See the porn emails behind the AG Kane scandal," metro.us (Aug. 27, 2015), *accessible at* https://www.metro.us/philadelphia/see-the-porn-emails-behind-the-ag-

kane-scandal-nsfw/zsJohz---ji2WtkN60BM.

e.  The emails expressly connect pornography with the following statements: "do an exceptional job," "[m]aking your boss happy," "[t]ake advantage," and "performance evaluations." *Id.*, link to Part 1. Shockingly, given the Sandusky scandal, one 2009 Fina email implies that young children should be encouraged to be sexually precocious. *Id.* at 13. One image celebrates drug use. *Id.* at 18. Two make light of sexual orientation. *Id.* at 19, 27. One shows a steel dart in a child's head as a supposed parenting technique. *Id.* at 25. Another manages to use the word "white" in a context simultaneously sexist and racist. *Id.* at 31.

f.  Fina also forwarded pornographic "fakes" involving a female political figure. *E.g., id.* at 36.

g.  A 2010 email forwarded by Fina containing a pornographic image included a reference to Bonusgate. *Id.* at 49, 51.

h.  Numerous other emails contain wholesale racist and misogynist content. *Id.*; "'Porngate' emails are graphic and offensive, but how do they exonerate Kathleen Kane?: Editorial," PennLive (Aug. 28, 2015), *accessible at* https://www.pennlive.com/opinion/2015/08/ porngate_emails_kane_editorial.html (describing additional content in light of events handled by the OAG).

i.  Fina worked as a prosecutor for the Commonwealth of Pennsylvania, a position in which he was responsible for the administration of justice that dealt in the liberty of individuals, and did so in apparent wholesale

17

disregard of discrimination laws such as the Pennsylvania Human

Relations Act and Title VII.

97.     These facts, in addition to those set forth above, render any official act of Fina

suspect, including his destruction of the witness statements and dealings with Madden in this

matter.

98.     Fina's conduct with Madden through improper emails, such as those uncovered in

Porngate, is essential to the issue of judicial bias, as by sending such emails to Madden, Fina

could have made Madden feel like part of the prosecution team even prior to joining the

Harrisburg criminal unit.

## **STANDARD OF REVIEW**

99.     To prevail under the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"), a petitioner seeking federal review of his conviction must demonstrate that the state

court's adjudication of his federal constitutional claim resulted in a decision that was contrary to

or involved an unreasonable application of clearly established U.S. Supreme Court precedent, or

resulted in a decision that was based on an unreasonable factual determination in light of the

evidence presented in state court. 28 U.S.C. § 2254(d)(1), (2); *Williams v. Taylor*, 529 U.S. 362,

375-76 (2000).

100.    The "contrary to" clause of section 2254(d)(1) is violated if the state court reaches

a result opposite to the one reached by the U.S. Supreme Court on the same question of law or

arrives at a result opposite to the one reached by the U.S. Supreme Court on a "materially

indistinguishable" set of facts. *Williams*, 529 U.S. at 405-06. An "unreasonable application" of

Supreme Court law occurs if the state court identifies the correct rule of law but applies that

principle to the facts of the petitioner's case in an unreasonable way. *Id.* at 413.

101.    "Evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

102.    Although the Court's review is based upon the state court record, the state court's determination of facts may be deemed unreasonable where the determination is objectively unreasonable in light of the evidence presented. *Dennis v. Secretary, Pa. Dept. of Corrections*, 834 F.3d 263, 281 (3d Cir. 2016).

103.    A guilty plea entered into in the absence of exculpatory evidence withheld by the prosecution is subject to challenge via a habeas petition. "A waiver cannot be deemed 'intelligent and voluntary' if 'entered without knowledge of material information withheld by the prosecution.'" *Sanchez v. United States*, 50 F.3d 1448, 1453 (9th Cir. 1995). *See also United States v. Brown*, 250 F.3d 811, 816 (3d Cir. 2001) (citing *Sanchez* with approval).

## GROUNDS OF UNCONSTITUTIONALITY OF PETITIONER'S CONVICTION AND SENTENCE

104.    There are two grounds for finding Preski's conviction and sentence to be unconstitutional: that his trial occurred before a judge with actual bias in favor of the prosecution, and that the prosecutor destroyed evidence that, once uncovered, was exculpatory.

## I.    THE PROSECUTION UNCONSTITUTIONALLY DESTROYED MATERIAL EXCULPATORY EVIDENCE

105.    It is undisputed in this petition that Lochetto told prosecutors, over the course of several sessions, that Preski scrupulously separated political and governmental business.  See Ex. "A" at 54a-55a (undersigned Counsel's Certification of September 30, 2015 interview).

106.    It is also undisputed that Lochetto's exculpatory information should have been transferred into the ROI, but the prosecution, including Fina, did not do so and destroyed 94

witness statements.

107.    Prosecutors have an affirmative duty to seek out and disclose exculpatory evidence, even in the absence of any request. *Dennis*, 834 F.3d at 284.

108.    A defendant must show three elements regarding a *Brady* violation: (1) that the evidence is favorable to the accused; (2) the evidence was suppressed by the prosecution (intentionally or unintentionally); and (3) the evidence must have been material such that prejudice existed. *Id.* at 284-85.

109.    Materiality does ***not*** require demonstration by a preponderance of the evidence of a different result, but only the reasonable probability of a different result. *Id.* at 285.

110.    Lochetto's testimony met all three prongs for a *Brady* violation because (1) it was exculpatory by its very nature, as Lochetto was a coworker who would have testified as to Preski's compliance with the law; (2) the prosecution suppressed the contents of Lochetto's statements by destroying any notes and failing to include the substance of her statements in the ROI; and (3) Lochetto's testimony is material because she was a concealed witness for the defense, who would have countered the prosecution narrative of impermissible intermingling of political and governmental duties by Preski.

111.    Additionally, the cumulative effect of the destruction of 94 witness statements and the incomplete ROI must be considered by the Court in addressing the *Brady* violation. *Kyles v. Whitley*, 514 U.S. 419, 436 (1995).

112.    The state court's refusal to grant PCRA relief addressed Preski's claim as a failure of diligence, which fundamentally misapplied the standards of *Brady* jurisprudence.

113.    The state court's refusal to grant PCRA relief misconstrued the materiality of Lochetto, who was a coworker of Preski who would have testified in his favor on the central

issue of separating political and governmental tasks.

114.    The United States Supreme Court has utterly rejected the notion that the diligence required of a defendant includes a presumption of prosecutorial misconduct. "Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed." *Banks v. Dretke*, 540 U.S. 668, 695 (2004).

115.    Preski satisfied reasonable diligence by filing his PCRA petition by October 9, 2015, when the suppressed evidence came to his attention in September 2015 and the interview with Lochetto took place on September 30, 2015.

116.    Because Preski only pled guilty ***during*** trial, it is important to note that the prosecution was required to produce exculpatory evidence to Preski before his plea under any conceivable construal of Preski's *Brady* rights, as the guilt phase of the criminal trial had commenced. *Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.").

117.    The state courts in this matter committed serious, substantive error in applying Preski's federal constitutional rights, that cannot be characterized as harmless, as the suppression of an exculpatory witness statement is central to *Brady*'s protections. *Kyles*, 514 U.S. at 435 ("Third, we note that, contrary to the assumption made by the Court of Appeals, 5 F.3d, at 818, once a reviewing court applying *Bagley* has found constitutional error there is no need for further harmless-error review.").

118.    Preski's guilty plea was tainted by the failure of the prosecution to disclose the

21

suppressed exculpatory evidence.

119.    "A waiver cannot be deemed 'intelligent and voluntary' if 'entered without knowledge of material information withheld by the prosecution.'" *Sanchez*, 50 F.3d at 1453 (9th Cir. 1995).

120.    The prosecution never disclosed that the ROI had left out exculpatory information or that the interviews of Lochetto had revealed exculpatory information.

121.    Preski would not have pled guilty had he known that there was exculpatory evidence such as that of Lochetto, or that the prosecution had tendered a false ROI.

122.    For these reasons, Preski should be granted discovery, an evidentiary hearing, and relief.

## II.    PRESKI FACED UNCONSTITUTIONAL BIAS FROM THE TRIAL COURT JUDGE

123.    Although unknown to Preski and undiscovered by him until September of 2015, the trial court in his case was impermissibly biased against him.

124.    Specifically, Madden's hiring by Fina and the OAG during the Computergate proceedings rendered the trial court impermissibly biased against Preski.

125.    Canon 5(c)(1) of the Code of Conduct for Law Clerks, as quoted in *First Interstate Bank of Arizona, N.A. v. Murphy, Weir & Butler*, 210 F.3d 983, 987–88 (9th Cir. 2000), states as follows:

> During the clerkship, a law clerk may seek and obtain employment to commence after the completion of the clerkship; if any law firm, lawyer, or entity with whom a law clerk has been employed or is seeking or has obtained *988 future employment appears in any matter pending before the appointing judge, the law clerk should promptly bring this fact to the attention of the appointing judge, and the extent of the law clerk's performance of duties in connection with such matter should be determined by the appointing judge.

126.   "[A] law clerk has a financial incentive to benefit a future employer. Given this financial incentive, if ever a law clerk were of a mind to influence his judge, it would likely be for the benefit of a future rather than a former employer." *Byrne v. Nezhat*, 261 F.3d 1075, 1102 (11th Cir. 2001), *abrogation on other grounds recognized by Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1357 (11th Cir. 2018).

127.   A law clerk's work is so intertwined with that of the judge that the clerk must be thought of as part of the judicial decision-making process:

> Law clerks are not merely the judge's errand runners. They are sounding boards for tentative opinions and legal researchers who seek the authorities that affect decision. Clerks are privy to the judge's thoughts in a way that neither parties to the law suit or his most intimate family members may be. I agree with the Sixth Circuit that the clerk is forbidden to do all that is prohibited to the judge.

*In re Asbestos Sch. Litig.*, No. 83-0268, 1989 WL 19395, at *2 (E.D. Pa. Mar. 1, 1989) (Naythons, M.J.) (referring to *Price Bros. Co. v. Philadelphia Gear Corp.*, 629 F.2d 444, 447 (6th Cir. 1980) ("The principle that reverberates throughout the decisions discussed above, however, is that a judge may not direct his law clerk to do that which is prohibited to the judge.").

128.   "It is the duty of the law clerk 'as much as that of the trial judge to avoid any contacts outside the record that might affect the outcome of the litigation.'" *Id.* (quoting *Kennedy v. Great Atlantic and Pacific Tea Co.*, 551 F.2d 593, 596 (5th Cir. 1977)).

129.   "[T]he relationship of clerk to judge itself is close enough that one might find an appearance of undue influence." *In re Allied-Signal Inc.*, 891 F.2d 967, 970 (1st Cir. 1989).

130.   Here, it is apparent that Madden was an underqualified candidate for the OAG position he applied for as trial approached in Preski's case; numerous decisions were issued immediately prior to trial, including those regarding the wholesale destruction of witness

23

statements, that were decided against Preski and (as detailed *infra*) in violation of the United States Constitution; and it is apparent that Madden received special treatment by the OAG in a surprisingly fast appointment.

131.    Madden also received a large pay increase as a result of this change in employment.

132.    The relationship between a judge and a law clerk is close enough that the interests of Madden created a bias such that Preski was denied a fair trial.

133.    "Due process guarantees 'an absence of actual bias' on the part of a judge." *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1905–06, 195 L. Ed. 2d 132 (2016) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)).

134.    The United States Supreme Court has explicitly found that an impermissible risk of judicial bias exists where a former prosecutor involved in the underlying criminal case heard a PCRA appeal as a justice of the Pennsylvania Supreme Court. *Id.* at 1905.

135.    In that case, former Chief Justice Castille had been administratively involved in the underlying criminal case and had also considered the defendant's PCRA petition on appeal.

136.    Despite the distant connection between these two events, and even where Chief Justice Castille's vote was not decisive, the Supreme Court held that even this slight interplay between the prosecutorial function and the judicial function could not be countenanced.

137.    Thus, judicial bias exists where there is a relationship between the judicial function and the prosecutorial function such that one bleeds over into the other.

138.    Furthermore, bias on the part of a judge is structural error, and is not, by its very nature, harmless. *Id.* at 1909 ("The Court has little trouble concluding that a due process violation arising from the participation of an interested judge is a defect 'not amenable' to

24

harmless-error review, regardless of whether the judge's vote was dispositive.").

139.    It is apparent that in this case, Madden was a law clerk who worked approximately 25% fewer hours in two years than he should have, and lacked prosecutorial experience, yet he was selected by Fina over more experienced applicants for the OAG position.

140.    Madden had a conflict of interest in working on Preski's case.

141.    Madden's failure to be disqualified from Preski's case tainted Preski's trial.

142.    The trial court's conflict here is consistent with that in *Williams*, as a criminal defendant deserves a trial before a judge separate and distinct from the prosecution.

143.    Preski's guilty plea was affected and influenced by this bias on the part of the trial court.

144.    "A waiver cannot be deemed 'intelligent and voluntary' if 'entered without knowledge of material information withheld by the prosecution.'" *Sanchez v. United States*, 50 F.3d 1448, 1453 (9th Cir. 1995). *See also United States v. Brown*, 250 F.3d 811, 816 (3d Cir. 2001) (citing *Sanchez* with approval).

145.    The prosecution never disclosed that Madden applied for employment as a criminal prosecutor in Harrisburg while simultaneously working on Preski's case.

146.    Preski would not have pled guilty had he known he was being denied a fair and impartial trial.

## CONCLUSION AND RELIEF REQUESTED

147.    For the reasons set forth *supra*, this Court should grant the petition herein in its entirety.

**WHEREFORE**, Petitioner Brian J. Preski respectfully requests that this Court:

1.  Issue a Writ of Habeas Corpus ordering that the Petitioner be released from his probation, that his judgment of conviction and sentence are vacated, and he be restored to pre-trial status;

2.  Enjoin Respondents from enforcing any condition of Petitioner's parole;

3.  Grant a hearing in this matter, with discovery on the issues presented herein to take place in advance of said hearing;

4.  Award Petitioner costs and attorney's fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

5.  Grant any such other relief as this Court may deem just, proper, and equitable.

Respectfully submitted,

Dated: 2-19-19

By: _____

George Bochetto, Esquire
David P. Heim, Esquire
**BOCHETTO & LENTZ, P.C.**
1524 Locust Street
Philadelphia, PA 19102
(215) 735-3900

*Attorneys for Petitioner*